# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO UNIFIED PORT DISTRICT,<br><br>                                    Plaintiff,<br><br>     v.<br><br>GENERAL DYNAMICS CORPORATION, LOCKHEED MARTIN CORPORATION,<br><br>                                    Defendants. | Case No. 07-cv-01955-BAS-WVG<br>*consolidated with*<br>16-cv-02026-BAS-KSC<br><br>**ORDER GRANTING MOTION TO CONFIRM SETTLEMENT AND BAR AND DISMISS CLAIMS**<br><br>**[ECF No. 105]** |
| SAN DIEGO UNIFIED PORT DISTRICT,<br><br>                                    Plaintiff,<br><br>     v.<br><br>LOCKHEED MARTIN CORPORATION, LOCKHEED MARTIN ENGINEERING & SCIENCES COMPANY,<br><br>                                    Defendants. | |

These consolidated actions arise out of environmental contamination emanating from two properties located alongside the San Diego Bay. The San Diego Unified Port District seeks relief against General Dynamics Corporation and Lockheed Martin Corporation for allegedly contaminating sediment in the San Diego Bay while conducting industrial and research activities at the properties. Presently before the Court is the parties' motion to confirm their combined settlement of these actions. (ECF No. 105.) The parties seek an order that approves their settlement, dismisses these actions, and provides contribution protection under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and California Code of Civil Procedure sections 877 and 877.6. (*Id.*) The Court held a hearing on the motion. (ECF No. 111.) For the following reasons, the Court **GRANTS** the parties' motion.

## I.    BACKGROUND

### A.    The Harbor Island East Basin Sediment Area

These actions concern contamination of the Northwest Portion of the Harbor Island East Basin of the San Diego Bay.[1] (Settlement Agreement § 1.27, Ex. A, ECF No. 106-1.)

---

[1]



SOURCE: Aerial from Google Earth Pro. Thiessen polygons from Exponent figure dated January 20, 2014.
HORIZONTAL DATUM: California State Plane, Zone 6, NAD83, U.S. Feet.
VERTICAL DATUM: Mean Lower Low Water (MLLW).

LEGEND:
☐ Approximate Marine Terminal and Railway
☐ 3380 North Harbor Drive Facilities

Since 1962, the Port District has held and managed the properties in this area in trust on behalf of the people of the State of California. In doing so, the Port District has leased to tenants two adjacent properties that border the East Basin—the Tow Basin Site and the Marine Terminal and Railway Facility Site. (*See id.*) As described below, state agencies have determined that the use of these sites led to contamination of the sediment in the East Basin, which the parties now seek to remedy in resolving these consolidated cases.

### 1. Tow Basin Site

The Tow Basin Site is a 61,630 square foot property located at 3380 North Harbor Drive, San Diego, CA 92101, that has historically been the site of various industrial facilities. (Settlement Agreement Ex. A; San Diego Regional Water Quality Control Board Draft Cleanup and Abatement Order No. R9-2017-0021 ("CAO") ¶ 2(a), Settlement Agreement Ex. B.) Previously, the Tow Basin Site included a 13,000 square foot building that contained an "open-top concrete water tank," which was used to test ship hull designs. (CAO ¶ 2(a).) Further, the property bordered several outfalls that emptied into the East Basin. (Settlement Agreement Ex. A.)

Over time, the Port District leased the Tow Basin Site to General Dynamics, Lockheed Martin, and the now-defunct Rohr Marine Inc. (Mot. 6:18–19; *see also* COA ¶ 3.) Initially, from 1954 to 1970, a General Dynamics subsidiary operated the Tow Basin Site. (*Id.* ¶ 3.a.) It used the facility "to test and develop hull designs for deep submersible vehicles and seaplanes." (*Id.*)

Next, in 1970, Lockheed Martin purchased the building at the Tow Basin Site. (CAO ¶ 3.b.) The company and its entities operated the site from 1970 to 1983, and they similarly used the site's building and open-top concrete water tank to "test various designs of boats, submersible vehicles, and seaplanes." (*Id.*)

Then, in 1983, Rohr Marine purchased the structure at the Tow Basin Site from Lockheed Martin and leased the underlying land from the Port District. (COA ¶ 3.c.) Rohr Marine conducted industrial operations at the site until 1986. (*Id.*) In 1986, the Port District

took ownership of the site's building and regained possession of the land after Rohr Marine "relinquished the facility due to bankruptcy." (*Id.*) The Port District then again leased the site to Lockheed Martin from 1986 until 1991, at which time the facility reverted back to the Port District. (*Id.* ¶ 3.b.)

### 2. Marine Terminal and Railway Facility Site

The Marine Terminal and Railway Facility Site is located at 1160 Harbor Island Drive, San Diego, CA 92101. (Settlement Agreement Ex. A.) The site consists of (i) a laboratory building and (ii) a pier and railway that extends into the East Basin of the San Diego Bay. (CAO ¶ 2(b).)

From 1966 to 2015, the Port District leased the Marine Terminal and Railway Facility Site to various Lockheed Martin entities. (CAO ¶ 3(b).) The facility was used for "a variety of maintenance and industrial activities." (*Id.* ¶ 2(b).) These activities included the operation of a "deep submergence vehicle" and "deep submergence rescue vehicle maintenance operations." (*Id.* ¶ 3(b).) General Dynamics was not involved in the operation of this site. (*See id.*)

### B. State Agency Proceedings

In the 1990s, the California Environmental Protection Agency's Department of Toxic Substances Control began investigating soil and groundwater contamination at the Tow Basin Site. On January 9, 1998, the Department issued an Imminent or Substantial Endangerment Remedial Action Order ("RAO") for the property. (RAO, ECF No. 105-8.) The RAO identified polychlorinated biphenyls ("PCBs"), total petroleum hydrocarbons ("TPH"), mercury, and volatile organic compounds ("VOCs") as contaminants found at the Tow Basin Site. (*Id.* § 2.4.) It also identified the Port District, General Dynamics, and Lockheed Martin as the parties responsible for remediating the contamination. (*Id.* § 2.1.)

Shortly after the issuance of the RAO, the parties submit that they entered into an agreement to cooperate in the investigation and cleanup of hazardous substances at the

Tow Basin Site. (Mot. 3:26–4:2.) After completing cleanup efforts for the soil and groundwater at the site in the 2000s, only the investigation into contaminated sediment at the site remained. (*Id.* 4:2–5.) The California Department of Toxic Substances Control transferred oversight for the sediment cleanup to the California Regional Water Quality Control Board for the San Diego Region ("Regional Water Board"). (*Id.*; *see also* CAO.)

In 2009, the Regional Water Board began investigating marine sediment impacts at the Tow Basin Site and instituted administrative proceedings. (*See* CAO ¶ 2; Gigounas Decl. ¶ 7, ECF No. 105-5.) Then, in 2011, the Regional Water Board instituted a separate proceeding relating to sediment contamination at the adjacent Marine Terminal and Railway Facility Site. (Regional Water Board Investigative Order No. R9-2011-0026, ECF No. 105-4.)

Following additional investigations and several mediation sessions with the parties, on October 21, 2016, the Regional Water Board issued an Administrative Draft Cleanup and Abatement Order ("CAO") that covered both the Tow Basin and Marine Terminal and Railway Facility Sites. (Gigounas Decl. ¶ 8.) The current version of the CAO provides that there have been "unauthorized discharges of wastes" at the sites into sediment in the East Basin. (CAO ¶ 2, Settlement Agreement Ex. B.) Due to these releases of "[PCBs], metals, and other pollutant wastes," contaminants have now accumulated in the East Basin's sediment. (*Id.*) Further, the Regional Water Board determined that the "concentrations of pollutants in the sediments of the East Basin of San Diego Bay are at levels that may have an impact on human health and the benthic community, and may have an impact on aquatic-dependent wildlife, thus creating a condition of pollution and nuisance in waters of the State." (*Id.* ¶ 8.) Thus, the CAO directs that all necessary corrective actions be taken to clean up and abate the contaminants in the sediment to acceptable cleanup levels. (*Id.* ¶¶ 12, A.)

//

//

//

### C. The Port District's Lawsuits

#### 1. Tow Basin Action

While the state agency investigations were ongoing, the Port District commenced the lead case, *San Diego Unified Port District v. General Dynamics Corp.*, No. 07-cv-01955-BAS-WVG (S.D. Cal. removed Oct. 9, 2007) ("Tow Basin Action"). The Port District filed the Tow Basin Action in 2005 in state court against Lockheed Martin and General Dynamics. (Compl., Notice of Removal Ex. A, ECF No. 1.) The action seeks to (i) recover costs the Port District allegedly incurred to investigate and remediate the Tow Basin Site and (ii) compel Defendants to perform further investigation and cleanup at the site. (*Id.* ¶¶ 13–48.)

In 2006, the parties submitted the Tow Basin Action to mediation and entered into an Interim Cost Sharing Agreement where they agreed to again share investigation costs for the site. (Gigounas Decl. ¶ 11.) In 2007, Lockheed Martin and General Dynamics removed the action to federal court. (ECF No. 1.) The parties later submitted a phased discovery plan, which the Court approved. (ECF No. 10.) This plan provided the parties would initially (1) investigate the contamination at the site, (2) determine whether sediment remediation would be required, and (3) assess the anticipated costs of any remediation. (*Id.*) Since approval of the phased discovery plan, the Tow Basin Action has not proceeded past the initial phase or been actively litigated. The parties have provided periodic case management statements to the Court as they attempted to mediate a resolution of the action and develop a plan to clean up the site that was acceptable to the Regional Water Board and all parties. (*See generally* ECF Nos. 14–93.)

#### 2. Marine Terminal Action

The Marine Terminal and Railway Facility Site is the subject of the member case, *San Diego Unified Port District v. Lockheed Martin Corp.*, No. 16-cv-02026-BAS-KSC (S.D. Cal. filed Aug. 11, 2016) ("Marine Terminal Action" or "MTA"). The Port District commenced the Marine Terminal Action on August 11, 2016, against Lockheed Martin

and one of its subsidiaries under state law and CERCLA. (MTA, ECF No. 1.) The action similarly seeks to (i) recover costs the Port District has allegedly incurred to investigate contamination at the Marine Terminal and Railway Facility Site and (ii) compel Lockheed Martin to remediate the property. (*See id.* ¶¶ 27–91.) Lockheed Martin has moved to dismiss several of the Port District's causes of action. (MTA, ECF No. 19.) However, on February 2, 2017, the Court stayed the Marine Terminal Action pending approval of the parties' Settlement Agreement. (MTA, ECF No. 25.) The Court then consolidated the Marine Terminal Action with the Tow Basin Action for all purposes. (MTA, ECF No. 29.)

### D. **Settlement Agreement**

Now, after spending years investigating the sites and forming a plan to remediate the contamination, the parties have reached a settlement of these actions. Under the Settlement Agreement, all parties expressly deny any liability; however, they each agree to contribute time and resources toward remediation of the Tow Basin Site and the Marine Terminal and Railway Facility Site. (Settlement Agreement §§ 2.1–2.3, 5.1.)

Specifically, Lockheed Martin agrees to "be solely responsible" for (i) Current Response Costs, (ii) all Future Response Costs, and (iii) the implementation and completion of the Remedial Action Plan under the CAO to the Regional Water Board's satisfaction. (Settlement Agreement § 2.1(a).)[2] Based on the proposed Remedial Action Plan, the estimated cost to remediate the sediment at the sites is $3.3 million. (Gigounas Decl. ¶¶ 13–14.) Further, Lockheed Martin will "remove all installations and improvements from the [Marine Terminal Facility] premises and restore the MTF premises" in accordance with the proposed demolition plan. (*Id.* § 2.1(b).) The company also agrees to "pay or reimburse the Port District for Future Development Costs" of up to $2.5 million that arise after the effective date of the Settlement Agreement. (*Id.* § 2.1(c).)

---

[2] Capitalized terms used in this order but not defined herein have the meanings ascribed to them in the Settlement Agreement.

As for General Dynamics, it promises to contribute to the cleanup effort by paying Lockheed Martin a lump sum of $850,000. (*Id.* § 2.3.)

In exchange, the Port District agrees to abate rent required under Lockheed Martin's lease of the Marine Terminal and Railway Facility Site for a period of thirty-six months. (Settlement Agreement § 2.2(a).) This period will begin "on the date all permits necessary to perform and complete the Remedial Action and removal of improvements have been approved." (*Id.*) The Port District will also "contribute the value of its staff time for the processing and implementation of the" Coastal Development Permit that is required for Lockheed Martin's remedial and demolition activities. (*Id.*) In addition, the Port District agrees to "waive its right to reimbursement of Past State Oversight Costs" from Defendants. (*Id.*) Last, the Port District covenants—with limitations—that it will not assert a claim against Lockheed Martin and General Dynamics for damages to natural resources wholly within the land at issue. (*Id.* § 2.2(d).)

## II.  ANALYSIS

The parties seek approval of their Settlement Agreement and an order providing them with contribution protection under section 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9613(f), and California Code of Civil Procedure sections 877 and 877.6. In considering this request, the Court first reviews CERCLA's statutory framework, including how CERCLA (i) imposes joint and several liability on parties who are potentially responsible for environmental contamination and (ii) allows parties to sue other potentially responsible parties for contribution. The Court then turns to whether providing the parties with contribution protection under 42 U.S.C. § 9613(f) and California state law is appropriate.

*//*

*//*

*//*

## A. **CERCLA**

Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). "Through a complex statutory framework, CERCLA provides for the 'liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites.' " *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013) (quoting *Carson Harbor Vill., Ltd. v. Cty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006)). The act's purpose is "to promote the timely cleanup of hazardous waste sites, ensure that polluters were held responsible for the cleanup efforts, and encourage settlement through specified contribution protection." *Id.*

Under 42 U.S.C. § 9607(a), CERCLA "imposes strict liability on four categories of potentially responsible parties (PRPs) for the cleanup costs of an environmental hazard, even if the person did not contribute to the contamination."[3] *Chubb Custom*, 710 F.3d at 956–57. Specifically, § 9607(a)(4) provides PRPs are responsible for:

> (A) all costs of removal or remedial action incurred by the United States Government or a State . . . not inconsistent with the national contingency plan;
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; [and]
> (C) damages for injury to, destruction of, or loss of natural resources . . . .

---

[3] The four broad classes of PRPs are: "(1) the current owners and operators of a vessel or facility, (2) the former owners or operators of a facility at the time of disposal of any hazardous substance, (3) any persons who arranged for disposal or treatment of a hazardous substance at any facility owned or operated by another party, and (4) transporters of such substances to a disposal or treatment facility." *Team Enters., LLC v. W. Inv. Real Estate Tr.*, 647 F.3d 901, 907 (9th Cir. 2011) (citing 42 U.S.C. § 9607(a)).

42 U.S.C. § 9607(a)(4).[4] "Once an entity is identified as a PRP, it may be compelled to clean up a contaminated area or reimburse the Government for its past and future response costs." *Burlington*, 556 U.S. at 609. Further, liability under CERCLA "is joint and several, meaning that a responsible party may be held liable for the entire cost of cleanup even where other parties contributed to the contamination." *Cal. Dep't of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910, 912 (9th Cir. 2010).

CERCLA also establishes a "remedial scheme" that includes "cost-recovery actions" and "contribution actions." *Chubb Custom*, 710 F.3d at 957. A cost-recovery action is based on the second category of liability listed above—42 U.S.C. § 9607(a)(4)(B). Thus, "[a] private person (someone who is not the United States, a state, or a tribe) who has incurred 'necessary costs of response' that are consistent with the [national contingency plan] may bring an action to recover such costs." *AmeriPride Servs. Inc. v. Tex. E. Overseas Inc.*, 782 F.3d 474, 480 (9th Cir. 2015) (citation omitted).

"In addition to allowing private parties to sue for cost recovery under § 9607(a), CERCLA also authorizes a responsible party who has incurred liability under § 9607(a) to bring an action for contribution under § 9613(f)(1) against any other potentially responsible party." *AmeriPride Servs.*, 782 F.3d at 480. Section 9613(f)(1) provides:

> **(1) Contribution**
>
> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims . . . shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate . . . .

---

[4] The "national contingency plan" is promulgated by the Environmental Protection Agency under CERCLA. *Carson Harbor Vill.*, 433 F.3d at 1265. It "outlines specific steps parties must take in choosing a remedial action plan and cleaning up hazardous waste." *Id.* The plan "is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *Wash. State Dep't of Transp. v. Wash. Nat. Gas Co., Pacificorp*, 59 F.3d 793, 802 (9th Cir. 1995).

42 U.S.C. § 9613(f). CERCLA does not define "contribution," but this term "is interpreted to mean 'the tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.' " *AmeriPride Servs.*, 782 F.3d at 480 (quoting *United States v. Atl. Research Corp.*, 551 U.S. 128, 138 (2007)).

As mentioned above, one of CERCLA's purposes is to encourage settlement through providing contribution protection—that is, preventing settling parties from being later sued for contribution by other joint tortfeasors. *E.g.*, *City of Emeryville v. Robinson*, 621 F.3d 1251, 1264 (9th Cir. 2010). Courts have provided contribution protection as part of settlements that fall into one of two categories: (a) those involving a state or the federal government or (b) those involving only private parties. *See, e.g.*, *Arizona v. City of Tucson*, 761 F.3d 1005, 1011–12 (9th Cir. 2014); *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1189 (9th Cir. 2000). For those settlements involving a state or the federal government, 42 U.S.C. § 9613(f)(2) applies. It provides contribution protection for the settling parties and also states that the settlement "reduces the potential liability of the [other potentially liable persons] by the amount of the settlement." 42 U.S.C. § 9613(f)(2).

The parties to the settlement in these consolidated cases do not include the State of California or the federal government. The Port District is a special government entity created by California's San Diego Unified Port District Act, Cal. Harb. & Nav. Code App. 1, but the parties agree that they are not seeking contribution protection under 42 U.S.C. § 9613(f)(2). Therefore, unlike other cases involving special government districts or municipalities, the Court need not determine whether the Port District qualifies as the

"State" under § 9613(f)(2).[5] The Court will instead analyze the parties' Settlement Agreement as a private party settlement, which implicates the Court's ability to provide contribution protection based on another CERCLA provision—§ 9613(f)(1).

This provision states: "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Unlike the provision for settlements involving a state or the federal government, § 9613(f)(1) does not specify the effect of a settlement involving less than all of the potentially liable parties. *See id.* That is, the provision does not state that an approved settlement will (i) protect the settling parties from "contribution regarding matters addressed in the settlement" and (ii) "reduce[] the potential liability of [other potentially liable persons] by the amount of the settlement." *See id.* § 9613(f)(2).

Accordingly, the Ninth Circuit has held "a district court has discretion under § 9613(f)(1) to determine the most equitable method of accounting for settlements between private parties in a contribution action." *AmeriPride Servs.*, 782 F.3d at 487. In circumstances like these where the "statute does not provide an approach for determining how to credit settlements in cases involving settlements with less than all the jointly and severally liable tortfeasors," courts generally rely on either: (a) "the Uniform Comparative Fault Act (UCFA), sometimes referred to as the proportionate share approach," or (b) "the Uniform Contribution Among Tortfeasors Act (UCATA), sometimes referred to as the pro tanto approach." *Id.* at 483. "The UCFA, which takes the proportionate share approach, provides that when an injured party settles with one of multiple tortfeasors, the settlement does not discharge the nonsettling tortfeasors but reduces the injured party's claims against

---

[5] *See, e.g.*, *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 (9th Cir. 2010) (mentioning the district court ruled "that CERCLA's definition of 'State' does not include municipalities" but "express[ing] no opinion on that issue"); *Carolina Cas. Ins. Co. v. Oahu Air Conditioning Serv., Inc.*, 994 F. Supp. 2d 1082, 1087 n.2 (E.D. Cal. 2014) (reasoning the plaintiff's alleged settlement "with the City and/or County of Sacramento is sufficient to demonstrate that it 'resolved its liability to . . . a state' pursuant to" § 9613(f)(1)); *see also Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist.*, 39 F. Supp. 3d 1051, 1055 (D. Ariz. 2014) (concluding an irrigation district did not fall within the definition of "State" in a CERCLA consent decree).

them by the amount of the settling tortfeasor's proportionate share of the damages."[6] *Id.* A court "adopting the UCFA proportionate share approach 'must therefore determine the responsibility of all firms that have settled, as well as those still involved in the litigation.' " *Id.* at 483–84 (quoting *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 20 (1st Cir. 2004)). The consequence of this approach is that tortfeasors who have not settled "will be responsible only for their proportionate share of the costs, even if the settling tortfeasor settles for less than its fair share of the injury." *Id.* at 484.

The Court agrees with the parties that the UCFA's approach "is consistent with the underlying goals of section [9613(f)(1)] and provides the most equitable method of apportioning fault." *See City of San Diego v. Nat'l Steel & Shipbuilding Corp.*, No. 09-cv-2275-WQH-BGS, 2015 WL 1808527, at *13 (S.D. Cal. Apr. 21, 2015). The parties have incorporated this approach into their Settlement Agreement, and the Settlement Agreement's effectiveness is conditioned upon the Court using the UCFA's approach. (*See* Settlement Agreement §§ 3.4(b), 5.2(a).)

Scrutinizing the parties' settlement, the Court finds it is appropriate to apply the same standards for examining consent decrees involving a state or the federal government. Hence, the Court will analyze whether the Settlement Agreement "is procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.' " *City of Tucson*, 761 F.3d at 1012 (quoting *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 748 (9th Cir. 1995)).

Starting with procedural fairness, this consideration is evaluated by reviewing "the negotiation process and attempt[ing] to gauge its candor, openness, and bargaining balance." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990); *accord*

---

[6] Section 6 of the Uniform Comparative Fault Act states:
> A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation, determined in accordance with the provisions of Section 2.

*Arizona v. Nucor Corp.*, 825 F. Supp. 1452, 1456 (D. Ariz. 1992). These consolidated cases involve sophisticated parties represented by counsel who are experienced in environmental litigation matters. Prior to reaching their settlement, the parties engaged in extensive arm's length negotiations, including several mediation sessions. They also investigated the environmental contamination for years before entering into the Settlement Agreement. This investigation included scientific sampling of the sites and various proceedings before the Regional Water Board. Thus, because all of the parties had ample opportunity to investigate the contamination and because they negotiated the settlement at arm's length, the Court concludes the settlement is procedurally fair.

As for whether the settlement is substantively fair and reasonable, the Court "must find that the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.' " *See City of Tucson*, 761 F.3d at 1012 (alteration in original) (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996)). The Ninth Circuit has reasoned "fair" and "reasonable" are "comparative terms." *Montrose*, 50 F.3d at 747. Therefore, to approve the settlement, "a district court must find that the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.' " *City of Tucson*, 761 F.3d at 1012 (alteration in original) (quoting *Charter Int'l Oil Co.*, 83 F.3d at 521).

As mentioned, the remediation estimate for the Tow Basin and Marine Terminal and Railway Facility Sites is $3.3 million. General Dynamics agrees to contribute $850,000 to the remediation, and Lockheed Martin will be responsible for the remaining cost to ensure the remediation is completed to the Regional Water Board's satisfaction—even if the cost to do so exceeds $3.3 million. The Port District also agrees to abate rental payments worth nearly $200,000, waive its past oversight costs, and contribute staff time worth

approximately $100,000 for procuring the coastal development permit that is required for the remediation.

Although the parties dispute their respective degrees of fault for the contamination, they explained at oral argument the reasoning behind their chosen allocation of responsibilities in the Settlement Agreement. In short, the allocation is based on the connection between the main contaminants of concern at the properties and the respective costs to remediate these contaminants. The two main contaminants of concern in the Northwest Portion of the East Basin are mercury and PCBs, and the remediation plan calls for two activities to remediate these contaminants. (*See* Remedial Action Plan §§ 1, 2.4–2.8, Settlement Agreement Ex. C.) First, a portion of the basin will be dredged. (*Id.* § 2.5.) Second, either clean sand cover or sand cover containing granulated activated carbon ("GAC") to absorb contaminants will be placed over portions of the basin.[7] (*Id.* §§ 1.41, 2.6–2.8, Fig. 2.) The first activity—the dredging—is more responsible than the second

---

7



07cv1955

activity for driving the cost of the remediation. The dredging activity is also more closely tied to remediating the mercury in the sediment, as opposed to the PCBs. It follows that the party who is potentially more responsible for mercury being in the sediment should bear the brunt of the cost to remediate the contamination at the properties.

Further, there are facts suggesting that the mercury may be attributable to operations at the Marine Terminal and Railway Facility Site during Lockheed Martin's tenure at the facility. General Dynamics did not operate at this property. Thus, that General Dynamics contributes $850,000—as opposed to a larger amount—to the settlement reflects its belief that the mercury and the associated dredging drives much of the cost to remediate the properties. Last, although the Port District believes any liability it may have is ultimately attributable to the tenants at the sites because it did not operate the sites, the Port District nevertheless agrees to concessions to avoid further litigation and to remediate the properties.

Accordingly, Lockheed Martin and General Dynamics, as current or former tenants of the properties that are primarily alleged to have been responsible for the contamination, shoulder the weight of the cost to remediate the properties. And, the division of responsibility between these parties is based on the varying cost to remediate the primary contaminants of concern at the properties. The Port District, as a potentially responsible party but not one that actively operated the facilities believed to have caused the contamination, understandably contributes less to the overall settlement but still provides concessions to resolve these cases. Thus, the Settlement Agreement is roughly correlated with acceptable measures of comparative fault—(i) the varying cost to remediate certain contaminants at the properties, (ii) which parties are believed to be responsible for the contaminants, and (iii) the degree of the parties' involvement in operating the properties. The Court consequently finds the settlement is substantively fair and reasonable. *See City of Tucson*, 761 F.3d at 1012.

In addition to being fair and reasonable, the parties' settlement is consistent with CERCLA's objectives. These goals are "accountability, the desirability of an unsullied

environment, and promptness of response activities." *See Nucor Corp.*, 825 F. Supp. at 1464 (quoting *Cannons Eng'g Corp.*, 899 F.2d at 90). The settlement holds the accountable parties responsible, particularly because the three parties believed to be responsible for the contamination have reached an agreement that provides the contamination will be remediated to the Regional Water Board's satisfaction. The settlement also furthers the desirability of an unsullied environment because the Settlement Agreement provides the contamination will be remediated to acceptable levels. Last, although the lead case has been pending for some time, the settlement still serves the objective of promptness of response activities. It ensures the contamination will now be cleaned up without the parties first devoting potentially several more years to continued litigation.

Accordingly, because the settlement is fair, reasonable, and consistent with CERCLA's objectives, the Court will approve the Settlement Agreement and provide contribution protection to the parties.[8]

### B. California Code of Civil Procedure Sections 877 & 877.6

The parties also seek contribution protection under California Code of Civil Procedure sections 877 and 877.6—California's "good faith settlement" statutes.[9] Section 877 governs the effect of a release given "in good faith before verdict or judgment to one

---

[8] Although the Court is adopting the UCFA's approach, which incorporates contribution protection, the Court will not assign specific shares of responsibility to the settling parties at this time. The parties did not request the Court do so at oral argument, and the Court is unaware of any third parties who are also potentially responsible for the contamination. If a third party surfaces, and it becomes necessary to determine the equitable share of responsibility of the parties settling in these consolidated cases, the Court will continue to adhere to the UCFA's approach and make this determination once the Court is apprised of the thirty party's role in the sites and causing the contamination.

[9] "When a district court sits in diversity, or hears state law claims based on supplemental jurisdiction, the court applies state substantive law to the state law claims." *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011). The Ninth Circuit "has held that California Code of Civil Procedure section 877 constitutes substantive law." *Id.* (citing *Fed. Savings & Loan Ins. Corp. v. Butler*, 904 F.2d 505, 511 (9th Cir. 1990)). Here, in addition to resolving potential CERCLA claims, the parties' combined settlement resolves various state law claims asserted by the Port District against Lockheed Martin and General Dynamics in the Tow Basin Action and the Marine Terminal and Railway Facility Action. Thus, the Court finds it appropriate to also consider the parties' request for contribution protection under state law.

– 17 –

or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights." Cal. Civ. Proc. Code § 877. The good faith settlement "shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release . . . or in the amount of the consideration paid for it, whichever is the greater." *Id.* § 877(a). Further, "[i]t shall discharge the party to whom it is given from all liability for any contribution to any other parties." *Id.* § 877(b); *see also id.* § 877.6(c) ("A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.")

"Section 877 establishes that a good faith settlement bars other defendants from seeking contribution from the settling defendant, but at the same time provides that the plaintiff's claims against the other defendants are to be reduced by 'the amount of consideration paid for' the settlement. Thus, while a good faith settlement cuts off the right of other defendants to seek contribution or comparative indemnity from the settling defendant, the nonsettling defendants obtain in return a reduction in their ultimate liability to the plaintiff." *Goodman v. Lozano*, 47 Cal. 4th 1327, 1333 (2010) (citations omitted) (quoting *Abbott Ford, Inc. v. Superior Court*, 43 Cal. 3d 858, 873 (1987)).

To determine whether a settlement had been made in good faith, California courts consider the factors identified by the California Supreme Court in *Tech–Bilt, Inc. v. Woodward–Clyde & Assocs.*, 38 Cal. 3d 488 (1985). *E.g.*, *Long Beach Mem'l Med. Ctr. v. Superior Court*, 172 Cal. App. 4th 865, 873 (2009). These factors include: (i) "a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability," (ii) "the amount paid in settlement," (iii) "the allocation of settlement proceeds among plaintiffs," and (iv) "a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial." *Tech–Bilt*, 38 Cal. 3d at 499. "The settling party's proportionate liability is one of the most important factors." *Long Beach Mem'l Med. Ctr.*, 172 Cal. App.

4th at 873. "Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants." *Tech–Bilt*, 38 Cal. 3d at 499.

An application of the *Tech–Bilt* factors to the parties' settlement largely overlaps with the Court's analysis of the settlement's fairness and reasonableness above. The first two factors, which focus on the potential recovery, the settling parties' shares of responsibility, and the amount paid in the settlement, favor a good faith determination. The Port District's potential recovery primarily includes the cost to remediate the contamination at the properties, which is estimated to be $3.3 million. Although Lockheed Martin and General Dynamics dispute their respective shares of liability, they agree to contribute amounts to the settlement that will ultimately lead to the cleanup of the property. Thus, there is no indication that the amount of the settlement is "grossly disproportionate to what a reasonable person at the time of settlement would estimate the [settling parties'] liability to be." *See City of Grand Terrace v. Superior Court*, 192 Cal. App. 3d 1251, 1262 (1987). Rather, except for the Port District's concessions described below, the amount of the settlement approximates the settling parties' potential liability. Hence, these factors favor a good faith determination.

The third *Tech–Bilt* factor is inapplicable. As for the fourth factor that focuses on the settling parties paying less in a settlement than after trial, this factor also favors a finding of good faith. The Port District gives up its claim to reimbursement for prior investigation costs and litigation expenses as part of the settlement. It also covenants that, with some limitations, it will not assert a natural resource damages claim. In addition, the Port District agrees to limit the amount it may seek from Lockheed Martin for Future Development Costs to $2.5 million. Thus, the settling parties are paying less in the settlement than they would have if the Port District pursued all of its available federal and state claims through trial.

Finally, there is no evidence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. The Court, after all, is not aware of any nonsettling defendants. That said, there is also no reason to believe that the settlement was not negotiated at arm's-length. This final consideration consequently also favors a good faith determination.

In sum, the *Tech–Bilt* factors weigh in favor of granting the parties' request. Therefore, the Court concludes that the settlement was made in good faith for purposes of California Code of Civil Procedure sections 877 and 877.6.

## III.   **CONCLUSION & ORDERS**

In light of the foregoing, the Court **GRANTS** the parties' joint motion to confirm their settlement and bar and dismiss claims (ECF No. 105). Accordingly, the Court further **ORDERS** that:

(1)   The Settlement Agreement is hereby approved as a good faith settlement and afforded all the rights and protections that accompany this determination.

(2)   The Court further finds and determines that the Settlement Agreement has been entered into in good faith within the meaning of Section 6 of the Uniform Comparative Fault Act, 12 U.L.A. 147 (1996), which is adopted in these combined cases for purposes of determining the legal effect of the Settlement Agreement. The Court also finds the Settlement Agreement constitutes a good faith settlement under California Code of Civil Procedure sections 877 and 877.6 and *Tech-Bilt, Inc. v. Woodward-Clyde & Associates*, 38 Cal. 3d 488 (1985). In addition, the Court finds the Settlement Agreement is fair, reasonable, and consistent with the purposes of CERCLA.

(3)   Pursuant to sections 877 and 877.6 of the California Code of Civil Procedure, CERCLA section 113(f)(1), and the approach taken by Section 6 of the UCFA, any and all claims for contribution or equitable indemnity against the parties arising out of the facts alleged in the complaints, counterclaims, or cross-claims in these consolidated actions (except such claims which are specifically excluded under the Settlement Agreement as

Excluded Matters), regardless of when such claims are asserted or by whom, relating to Covered Matters under the Settlement Agreement are hereby **BARRED**. Such claims by any party are barred regardless of whether they are brought pursuant to any federal or state statute, common laws, or any other theory, as any such claims against the parties arising out of the facts alleged in these actions are in the nature of contribution claims arising out of a common liability, whether framed in terms of federal or state statute or common law.

(4)    All claims, cross-claims, counterclaims, or any other claims that have been made by and between the parties, and each of them, in these actions are hereby dismissed with prejudice, except and subject to: (1) the Court retaining continuing jurisdiction to enforce the terms of the Settlement Agreement, (2) the rights of the parties under the Settlement Agreement to later assert any and all claims related to Excluded Matters, which claims shall not be deemed barred by entry of judgment or dismissal pursuant to the Settlement Agreement or this order, (3) other rights expressly reserved under the Settlement Agreement, and (4) this order becoming final and effective.

(5)    The Court shall retain jurisdiction over both the subject matter of this Settlement Agreement and the parties for the duration of the performance of the terms and provisions of the Settlement Agreement for the purpose of enabling the parties, and each of them, to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate to construe, implement, or enforce compliance with the terms of the Settlement Agreement, which rights and obligations shall survive the dismissal of these actions.

(6)    The parties shall bear their own attorneys' fees and costs in these consolidated actions through the date of this order.

(7)    The Clerk of the Court shall file a copy of this order in both actions. This order shall constitute the "Order Approving Agreement" under Section 5.2 of the Settlement Agreement. Further, the Clerk of the Court is directed to close both the Tow Basin Action—*San Diego Unified Port District v. General Dynamics Corp.*, No. 07-cv-01955-BAS-WVG (S.D. Cal. removed Oct. 9, 2007), and the Marine Terminal Action— *San*

*Diego Unified Port District v. Lockheed Martin Corp.*, No. 16-cv-02026-BAS-KSC (S.D. Cal. filed Aug. 11, 2016).

      **IT IS SO ORDERED.**


**DATED: June 20, 2017**

**Hon. Cynthia Bashant**
**United States District Judge**